UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STEVEN CARROLL,                )
                                 )
Plaintiff,                      )
                                 )
v.                           )
                                 )     Case No. 4:13-CV-830-RWS-SPM
                                 )
                                 )
CAROLYN W. COLVIN,       )
Acting Commissioner of Social Security,   )
                                 )
Defendant.                 )

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the

applications of Plaintiff Steven Carroll for Disability Insurance Benefits ("DIB") under Title II

of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act"). This

matter was referred to the undersigned United States Magistrate Judge for review and a

recommended disposition pursuant to 28 U.S.C. § 636(b). The undersigned recommends that the

decision of the Commissioner be reversed and the case remanded for further proceedings.

# I.  PROCEDURAL HISTORY

On August 9, 2010, Plaintiff applied for DIB and SSI, alleging that he had been unable to work since January 19, 2010. (Tr. 160-65). Those applications were initially denied. (Tr. 84-85). On November 1, 2010, Plaintiff filed a Request for Hearing by an Administrative Law Judge ("ALJ") (Tr. 107-08). After a hearing on March 29, 2012, the ALJ issued an unfavorable decision on June 26, 2012. (Tr. 9-27). Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council on July 27, 2012 (Tr. 6-8), but the Appeals Council declined to review the case on March 29, 2013 (Tr. 1-3). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

# II.  FACTUAL BACKGROUND

## A.  BACKGROUND

Plaintiff was born on January 12, 1976 and was 36 years old as of the date of the hearing. (Tr. 40). Plaintiff has a high school education and has worked in the past as a grill cook. (Tr. 40, 46). Plaintiff was diagnosed with a learning disability as a child, reads at a third-grade level, and has trouble with math. (Tr. 46-47, 50-51). He has bipolar disorder that causes mood swings and causes him to anger easily. (Tr. 41). He also has epilepsy, treated with medication, which prevents him from driving. (Tr. 44).

Plaintiff left his mother's home in 2005 because of fights with his mother and stepfather. (Tr. 47-48). He moved to a group home in St. Louis, where he received help from Life Skills Foundation. (Tr. 47). Plaintiff later got married and moved to Ohio but subsequently separated from his wife and moved to a rescue mission in Ohio for several months. (Tr. 42, 46). Since

April 2010, Plaintiff has been living with his mother. (Tr. 42). He participates in a program called Community Living, which involves social activities and job skills training. (Tr. 49-50).

Plaintiff's daily activities include making his bed, getting dressed, going for bike rides or walks, watching television, shopping, making lunch, doing household chores, painting, reading, writing a book, and working on puzzles. (Tr. 43, 48).

## B. RECORDS OF TREATING SOURCES

On August 11, 2007, Plaintiff was admitted to St. Alexius Hospital for agitation and physically aggressive behavior, and he was discharged twelve days later. At discharge, he was diagnosed with bipolar affective disorder, seizure disorder, and chronic mental illness in relapse, and he was assigned a Global Assessment of Functioning ("GAF") score of 20.[1] (Tr. 533).

On June 30, 2009, Plaintiff was treated at Parkview Counseling Center, reporting a history of bipolar disorder and anger management issues. (Tr. 396, 407). He indicated that he had been physically aggressive and that he ranted and raved, yelled, threw things, and got angry about twice a week. (Tr. 404). He also indicated that he can be "happy one minute and then a complete idiot the next." Plaintiff was found to have poor symptom management, anger management, and communication skills. (Tr. 405). He had an odd appearance and manner, was irritable at times, had a flat affect, had no insight and poor judgment, was vague, and had

---

[1] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF score of 11–20 indicates some danger of hurting self or others, occasionally failing to maintain minimal personal hygiene, or gross impairment in communication. *Id.* at 34.

impaired memory. The estimate of his intelligence was "borderline." (Tr. 412). His diagnosis was mood disorder, not other specified, and his GAF was 55. (Tr. 409).[2]

In a psychiatric evaluation dated June 30, 2009, Plaintiff explained that when he gets overwhelmed or stressed, he "explodes." (Tr. 417). His eye contact was avoidant and intense, his activity was agitated, and his thought process was circumstantial and blocked. (Tr. 418). He had an impaired memory and borderline intelligence. His GAF was 55. (Tr. 419). The physician prescribed daily doses of Invega for Plaintiff's mood treatment. (Tr. 420).

On August 20, 2009, Plaintiff stated that he and his wife continued to fight and were filing for divorce. His mood was angry and agitated, and his insight and judgment were superficial. (Tr. 415).

On September 17, 2009, Plaintiff stated that he was less agitated and was doing well with medications. (Tr. 413).

On October 18, 2009, Plaintiff arrived at St. Elizabeth Health Center by ambulance after having a seizure. Plaintiff did not believe he had taken all of his medications the day before. (Tr. 392).

On March 9, 2010, Plaintiff went to the Emergency Department at St. Elizabeth Health Center, complaining of anger management problems and stating that he felt like he would hurt someone. (Tr. 357). At the time of the evaluation, Plaintiff was not angry, but his psychiatric review showed feelings of anxiety, depression, and suicidal thoughts. (Tr. 363).

---

[2] A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* 32.

Plaintiff visited the Crider Health Center on May 4, 2010. (Tr. 423). He was not anxious, did not have pressured speech, and did not have suicidal ideation. (Tr. 424).

On June 17, 2010, Plaintiff was evaluated by Jennifer Shashek, M.D., at The Psychiatric Center in St. Louis for bipolar disorder. Plaintiff described having had mood swings and explosive outbursts since seventh or eighth grade. Plaintiff had been taking Risperdal, which was helping him. (Tr. 429). Dr. Shashek assessed bipolar disorder (not otherwise specified) and a GAF of 40-50.[3] She also noted that Plaintiff had a learning disability, with a sixth grade reading level and a third grade math level. Dr. Shashek maintained Plaintiff's Risperdal prescription and recommended counseling. (Tr. 430).

On July 21, 2010, Plaintiff told Dr. Shashek that things had "been pretty good," with his mood being stable and his sleep normal; he had no complaints. Plaintiff told Dr. Shashek that he had applied for a job at White Castle. Dr. Shashek noted that he was "very into routine." (Tr. 433). Dr. Shashek described Plaintiff as being appropriately dressed and groomed, cooperative, and having good eye contact. His mood was "okay," his affect was constricted with an occasional smile, and his logical thought was concrete. (Tr. 432).

On August 19, 2010, Plaintiff had another appointment with Dr. Shashek. (Tr. 467). He was dressed appropriately, groomed, and cooperative; had good eye contact; and had regular speech. His affect was constricted. (Tr. 468).

On September 21, 2010, Plaintiff told Dr. Shashek that with the higher dosage of Risperdal he was feeling less agitated, less angry, and was finding things to do, such as

---

[3] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* 32.

exercising. He was appropriately dressed, groomed, and cooperative, and he maintained good eye contact. (Tr. 469).

On November 23, 2010, Plaintiff visited Dr. Shashek and told her that he still becomes annoyed when people tell him what to do. He was dressed appropriately, groomed, cooperative, and maintained good eye contact. (Tr. 470). He was assessed as having bipolar disorder and seizure disorder, and his mood was described as "fine." (Tr. 470-71).

On December 7, 2010, Plaintiff returned to Crider Health Center for a medication refill. (Tr. 460). He was alert and oriented, with no unusual anxiety or evidence of depression. (Tr. 461).

On February 22, 2011, Plaintiff visited Dr. Shashek and told her that he might stay a month or the whole summer in Virginia with his father. (Tr. 471). Plaintiff was dressed appropriately and properly groomed. (Tr. 473).

On June 7, 2011, Plaintiff visited the Crider Health Center for medication management. (Tr. 482). He was stable on Risperdal, had a good energy level, was alert and oriented, and had no unusual anxiety or evidence of depression. (Tr. 482-83).

Also on June 7, Plaintiff visited Dr. Shashek and told her his summer was going well. (Tr. 492). Plaintiff was appropriately dressed and groomed, cooperative, and held good eye contact. His mood was good, his affect was appropriate, and his logical thought was concrete. (Tr. 493).

On August 8, 2011, Plaintiff presented at the Crider Health Center for medication management. He presented with no dizziness, vision changes, seizures, fatigue, fever, night sweats, or psychiatric symptoms. (Tr. 485). His physical exam indicated he was alert and oriented, with no unusual anxiety or evidence of depression. (Tr. 486).

On September 13, 2011, Plaintiff saw Dr. Shashek and reported, "I feel I've been fine." He was appropriately dressed, was cooperative, maintained good eye contact, and had an appropriate affect. (Tr. 494-95).

On November 29, 2011, Plaintiff had a meeting at Community Access Training to develop a "Person Centered Plan." (Tr. 305-08). It was noted that he wanted to get a job that was of interest to him. (Tr. 306). He and his mother indicated that he had anger issues in the past and would yell or punch the wall, but he stated that this had not been a problem since he had started attending counseling sessions and taking Risperdal. (Tr. 306).

On December 13, 2011, Plaintiff visited Dr. Shashek. His mood was "pretty good," his affect was appropriate, he was dressed and groomed appropriately, he was cooperative, and he made good eye contact. (Tr. 497).

### C. PLAINTIFF'S IQ TESTS AND SCHOOL HISTORY

Plaintiff was evaluated by the Special School District on February 2, 1993. (Tr. 547-69). He failed the motor, cognition, and academics screenings. His overall cognitive functioning was within the low average range of abilities. (Tr. 547). The Stanford Binet: Fourth Edition was administered, and the score of 67 indicated that Plaintiff was functioning within the mentally retarded range. (Tr. 543). It was noted that in May of 1985, Plaintiff had been tested and assigned a verbal IQ of 85, a performance IQ of 86, and a full-scale IQ of 84. (Tr. 545). The evaluation noted that Plaintiff's short- and long-term memory skills were weak; that he required numerous repetitions and restatements to maintain new concepts; that his logical skills and analytical skills were weak; that his organizational skills and task focus were weak; and that he experienced difficulty in transitioning between activities and in working independently and in a group setting. (Tr. 545-46). He performed slightly better with tasks that were presented verbally

and to which he responded verbally. (Tr. 543). The Fehrenbach Sentence Completion Test indicated that Plaintiff was not well-adjusted socially and that his anger interfaced in his social and academic functioning, as well as goal direction and self-esteem. Plaintiff was noted to have a learning disability in the areas of written expression and mathematics reasoning. (Tr. 542).

An individualized education program ("IEP") meeting for Plaintiff was held on March 3, 1994, at the Special School District of St. Louis County. (Tr. 559). Due to his learning disability, Plaintiff required special education assistance, vocational training, on-site job experience, and special instructions. (Tr. 562). Plaintiff completed his academic course of study, receiving a 22-credit diploma and performing successfully in the Lambert Airport Satellite Program in Commercial Cleaning. (Tr. 552).

### D.  OPINION EVIDENCE AND CONSULTATIVE EXAMINATIONS

#### 1.  *Opinion of Kyle DeVore, Ph.D.*

On October 15, 2010, state agency medical consultant Kyle DeVore, Ph.D., completed a Psychiatric Review Technique form and a mental RFC assessment. (Tr. 439-54). He found that Plaintiff had medically determinable impairments of learning disorder and bipolar disorder. (Tr. 440, 442). He found Plaintiff had a mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 447). He found that Plaintiff had moderate limitations in the ability to understand, carry out, and remember detailed instructions; to work in coordination with or in proximity to others without being distracted by them; to interact appropriately with the general public; to accept instructions and respond to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. He found no significant limitations in the other areas considered. (Tr. 452-53).

### 2. Opinions of Jennifer Shashek, M.D.

On March 16, 2011, Plaintiff's treating psychiatrist, Dr. Shashek, completed a mental RFC questionnaire. (Tr. 474-48). She stated that Plaintiff had bipolar disorder and epilepsy, that his current GAF was 50, and that his highest GAF in the past year was 50. (Tr. 474). She also indicated that he had been diagnosed with a learning disability but that she did not have the test results. (Tr. 477-78). She stated that his prognosis was fair when he was taking medication. (Tr. 474).

Dr. Shashek opined that Plaintiff was "seriously limited, but not precluded" from functioning in most of the mental abilities and aptitudes needed to work, including the ability to maintain attendance and be punctual, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being unduly distracted, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, deal with normal work stress, be aware of normal hazards and take appropriate precautions, understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others, deal with stress of semiskilled and unskilled work, interact appropriately with the general public, maintain socially appropriate behavior, travel in unfamiliar places, and use public transportation. (Tr. 477). Dr. Shashek stated Plaintiff had a limited but satisfactory ability to understand and remember very

short and simple instructions, carry out very short and simple instructions, maintain attention for two-hour segments, and adhere to basic standards of neatness and cleanliness. (Tr. 476-77).

Dr. Shashek further opined that Plaintiff's impairments would cause him to be absent from work about four days per month; that Plaintiff could not manage benefits in his own best interest; and that Plaintiff's impairment had lasted or could be expected to last at least twelve months. (Tr. 478). She indicated that most of Plaintiff's limitations were attributable to his low frustration tolerance, his anger issues, and his tendency to have anger outbursts when told what to do. (Tr. 476-77). With regard to the abilities specifically needed to do skilled work, she found that Plaintiff's learning disability contributed to his limitations. (Tr. 477).

On February 17, 2012, Dr. Shashek filled out another mental RFC questionnaire. (Tr. 498). This assessment was nearly identical to her first assessment, though she also noted that Plaintiff had concrete and tangential thinking. (Tr. 498-503).

### 3. *Opinion of David Peaco, Ph.D.*

On January 16, 2012, David Peaco, Ph.D., conducted a psychological evaluation of Plaintiff. Dr. Peaco noted that Plaintiff's speech, flow of thinking, affect, and mood were normal, and his orientation was intact. (Tr. 570). Dr. Peaco found Plaintiff's delayed memory and fund of general information to be below average but found his overall level of intellectual functioning to be average. (Tr. 570-71). Dr. Peaco opined that Plaintiff was able to understand and remember simple instructions and that he had mild impairments in persistence in completing tasks, in concentration, and in social functioning. He also found that Plaintiff's capacity to cope with and adapt to the world around him was markedly impaired due to manic symptoms and seizures. Dr. Peaco diagnosed bipolar disorder and assigned a GAF of 50. (Tr. 571).

### E. VOCATIONAL EVIDENCE

A vocational expert ("VE"), Dale Thomas, testified at the hearing. (Tr. 54-61). The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience who had no physical limitations other than a need to avoid hazards such as dangerous machinery, unprotected heights, and climbing ladders or scaffolds; who could function in situations where instructions were more in the nature of verbal or demonstration over written instructions; who could have no more than occasional changes in work schedule or routine; and who would be limited to jobs that did not involve interacting with the public and involved only occasional contact with coworkers and supervisors. (Tr. 55). The VE testified that such an individual could not perform Plaintiff's past jobs, which involved hazards in the kitchen environment. (Tr. 55-56). However, he testified that such an individual could perform other jobs such as production electronics worker (*Dictionary of Occupational Titles* ("*DOT*") No. 726.687-010; 125,000 jobs nationally and 3,000 in Missouri); laundry worker (*DOT* No. 302.685-010; 296,000 nationally and 7,200 in Missouri), and hand packager (*DOT* No. 920.687-122, 60,000 in the nation and 1,000 in the region). The VE testified that these jobs would still be available for an individual who could not make any significant use of mathematics in his work. (Tr. 56-57). However, he testified that no jobs would be available for an individual who would miss four days of work per month in an unpredictable manner. (Tr. 58-59).

### III.    STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a plaintiff must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e). At Step Four, the Commissioner determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.     DECISION OF THE ALJ

After a review of the hearing testimony and all of the evidence submitted before him, the ALJ concluded that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2011; has not engaged in substantial gainful activity since January 9, 2010, the alleged onset date; has the severe impairments of seizure disorder, bipolar disorder, and a learning disorder; and does not have an impairment or combination of impairments that meets or

medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 14-15). The ALJ found that Plaintiff has the RFC to perform medium work, except that he must avoid exposures to hazards such as dangerous machinery and unprotected heights; cannot climb ropes, ladders, or scaffolds; requires jobs where instructions are more verbal or demonstrative rather than written; can perform in work settings with no more than occasional changes in schedule or work routine; is limited to jobs that do not involve interaction with the public as a part of job duties and jobs that have no more than occasional contact with coworkers and supervisors; and is limited to jobs that do not involve making change or using math to perform job functions. (Tr. 17). Relying on the testimony of the vocational expert, the ALJ found that there are other jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as production worker/electronics worker, laundry worker, and hand packager. (Tr. 26-27). The ALJ concluded that Plaintiff therefore has not been under a disability, as defined in the Social Security Act, from January 9, 2010 through the date of the decision. (Tr. 27).

In his challenge to the ALJ's decision, Plaintiff argues that (1) the ALJ's Step Three finding that Plaintiff did not satisfy listing § 12.05C was not supported by substantial evidence; (2) the ALJ erred by not giving controlling weight to the opinions of his treating psychiatrist, Dr. Shashek; (3) the RFC is not supported by "some medical evidence"; and (4) the testimony of the vocational expert did not constitute substantial evidence in support of the ALJ's Step Five finding that Plaintiff could perform other jobs in the national economy.

## V. <u>DISCUSSION</u>

### A. STANDARD FOR JUDICIAL REVIEW

The decision of the Commissioner must be affirmed if it complies with the relevant legal requirements and is supported by substantial evidence on the record as a whole. *See* 42 U.S.C. §

405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore*, 572 F.3d at 522). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. The ALJ's Finding That Plaintiff's Intellectual Impairment Does Not Satisfy the Requirements of Listing § 12.05C

Plaintiff argues that the ALJ erred in his determination that Plaintiff's impairment did not meet or equal the severity of Listing § 12.05C. Listing § 12.05 states, in relevant part,

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .

> C. A valid verbal, performance, or full scale IQ of 60 through 70
> and a physical or other mental impairment imposing an additional
> and significant work-related limitation of function; . . . .

20 C.F.R. pt. 404, subpt. P, App'x 1, § 12.05. The Eighth Circuit has held that to meet the requirements of Listing 12.05C, a claimant must show: "(1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Maresh v. Barnhart,* 438 F.3d 897, 899 (8th Cir. 2006). The ALJ found that Plaintiff "fail[ed] to present persuasive evidence that satisfy the necessary criteria [of any of 12.05's paragraphs]." (Tr. 17).

Plaintiff argues that the ALJ's finding at Step Three is not supported by substantial evidence because the ALJ failed to consider an IQ score of 67 that was obtained when Plaintiff was 17 years old.[4] The undersigned agrees.

In his discussion of Plaintiff's IQ, the ALJ stated, "in approximately January 1993, when [Plaintiff] was in 11th grade, he took the Stanford-Binet Intelligence Scale, 4th ed. (Ex. 1E/15). He scored a Full-Scale IQ of 84, indicating the average range of intellectual functioning." (Tr. 18). However, the ALJ appears to have misread the cited record. The cited record does contain the results of a Stanford-Binet test from 1993; however, Plaintiff's composite IQ score on that test was 67, not 84. This record notes that on an *earlier* test (from 1985), Plaintiff scored an 84. (Tr. 72, 195). Thus, it appears that the record contains at least two IQ scores: a score of 84 (obtained when Plaintiff was nine years old), and a score of 67 (obtained when Plaintiff was 17

---

[4] There appears to be no dispute that the third element of Listing 12.05C is satisfied, because the ALJ found both physical and other mental impairments (bipolar disorder and epilepsy) and included in the RFC significant work-related restrictions related to those impairments. (Tr. 14, 17).

years old). If the lower IQ score were accepted, Plaintiff would satisfy the requirements of Listing 12.05C.

"The Social Security regulations do not specify . . . which score the ALJ should disregard when there are differing scores from two apparently valid IQ tests." *Muncy v. Apfel*, 247 F.3d 728, 733 (8th Cir. 2001). In addition, "'the Commissioner is not required to accept a claimant's IQ scores . . . and may reject scores that are inconsistent with the record.'" *Miles v. Barnhart*, 374 F.3d 694, 699 (8th Cir. 2004) (quoting *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)). However, an ALJ must provide legitimate reasons for the decision to disregard an IQ score. *See Muncy*, 247 F.3d at 734-35 (remanding because the ALJ relied on the higher of two IQ scores but "neither addressed the discrepancy between [the claimant's] two IQ scores nor discussed what factors called into question the [lower] score's validity"); *Murphy v. Colvin*, Civ. No. 1:12-cv-01099, 2013 WL 4198345, at *4 (W.D. Ark. Aug. 15, 2013) (remanding where the ALJ relied on the higher of two IQ scores without providing reasons why the lower score was invalid; stating, "an ALJ may reject IQ scores that are inconsistent with the record but he must provide a legitimate basis for his decision").

Defendant argues that the ALJ appropriately determined that Plaintiff failed to satisfy Listing 12.05C because the IQ score from the 1993 test was invalid. Defendant notes that the interpretation of the 1993 test results states, in part, "[Plaintiff]'s behavior and cooperation deteriorated as the testing progressed and the examiner did not believe the earned scores reflected [Plaintiff's] abilities but rather the degree to which his behavior would interfere with his ability to perform." (Tr. 197). However, the interpretation of the 1993 test also states, "[b]ehaviors during this assessment were significant but *did not interfere with the overall validity of the results*." (Tr. 197) (emphasis added). Based on these statements, it is unclear whether the

examiner considered the IQ test to be valid. Moreover, it is clear that the ALJ never made a determination that the results of the 1993 test were invalid; instead, he appeared to accept them but mistakenly believed that they showed an IQ score of 84. (Tr. 18). It does not appear that the ALJ was even aware that the record contained a score of 67.

Because the record contains a Listing-level IQ score that was never assessed by the ALJ, the ALJ's analysis is incomplete, and the undersigned cannot say that his decision is supported by substantial evidence. This case must be remanded for the ALJ to assess Plaintiff's different IQ scores, provide legitimate reasons for his assessment of those scores, and determine whether Plaintiff satisfies Listing 12.05C. *See Muncy*, 247 F.3d at 735 (remanding and directing the Commissioner "to enter specific findings detailing why [the claimant's] first IQ score should not be adopted as the controlling score"); *Murphy*, 2013 WL 4198345, at *4 (remanding for the ALJ to perform "a proper and complete analysis" of the validity of conflicting IQ scores for purposes of assessing whether Plaintiff met the requirements of Listing 12.05C).

### C. THE OPINION OF DR. SHASHEK

Plaintiff also argues the ALJ erred in his determination of Plaintiff's RFC because the ALJ did not give controlling weight to the opinion of his treating psychiatrist, Dr. Shashek, that he had serious limitations in nearly all areas of mental functioning required for work and would have to miss four days of work per month. The undersigned recognizes that the ALJ's reconsideration of Plaintiff's IQ scores and re-evaluation of the Step Three finding may render this issue moot or may affect the ALJ's assessment of the relevant medical opinions and Plaintiff's RFC. Nevertheless, the undersigned will address the specific issue of the ALJ's assessment of Dr. Shashek's opinion.

It is well established that "[a] treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)). However, "[w]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." *Halverson v. Astrue*, 600 F.3d 922, 929-30 (8th Cir. 2010) (quotation marks omitted). "'When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so.'" *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (quoting *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007)).

The ALJ did give "some evidentiary weight" to Dr. Shashek's opinions, and he incorporated several of them into Plaintiff's RFC. (Tr. 20-22). Specifically, the ALJ included in the RFC limitations that reflected Dr. Shashek's opinion that Plaintiff would be seriously limited in his ability to respond appropriately to changes in routine work setting, to interact appropriately with the general public, to work in coordination with or proximity to others, to get along with co-workers without distracting them or exhibiting behavioral extremes, to accept instructions and respond appropriately to criticism from supervisors, and to be aware of normal hazards and take appropriate precautions. (Tr. 17, 476-77).

However, the ALJ found that Dr. Shashek's opinions that Plaintiff would be seriously limited in almost all mental abilities needed to perform work (including maintaining regular attendance, making simple work-related decisions, asking simple questions, and using public transportation) and would have to miss four days of work per month were inconsistent with the record as a whole, including Dr. Shashek's own treatment notes. (Tr. 21). That finding was supported by substantial evidence. Dr. Shashek indicated that most of Plaintiff's limitations were

attributable to his low frustration tolerance, anger outbursts, and anger issues. (Tr. 500-01). Dr. Shashek's first treatment note is consistent with that opinion, indicating that Plaintiff had mood swings and "explosive outbursts" and got "pissed off" easily, and should be treated with Risperdal and counseling. (Tr. 429-30). However, as the ALJ found, Dr. Shashek's subsequent treatment records indicate that Plaintiff's anger issues and mood improved significantly with treatment. (Tr. 21). On July 21, 2010, Dr. Shashek noted that Plaintiff had been "mostly good"; that his mood had been "pretty good" and "stable"; and that he "doesn't really have any complaints." (Tr. 19, 21, 433). In September 2010, Plaintiff told Dr. Shashek that with a higher dosage of Risperdal he was feeling less agitated, less bored, and less angry, and was finding things to do, such as exercising and writing. He was also cooperative and had an appropriate affect. (Tr. 19, 21, 469). On November 23, 2010, Dr. Shashek found Plaintiff's mood "fine" and his affect appropriate. (Tr. 470). Also in June 2011, Plaintiff told Dr. Shashek that his summer was going well, and she noted that his mood was good, though he was still bored sometimes. (Tr. 492-93). In September 2011, Plaintiff told Dr. Shashek, "I feel I've been fine," and he was cooperative, with an appropriate affect. (Tr. 494-95). On December 13, 2011, Dr. Shashek noted that Plaintiff's mood was "pretty good," and his affect was appropriate. (Tr. 497). Indeed, even in her opinion regarding Plaintiff's limitations, Dr. Shashek indicated that Plaintiff's Risperdal "keeps anger under control" and "helps him keep his temper." (Tr. 474, 498).

Other records similarly suggest that Plaintiff's anger and mood symptoms were controlled with medication and that his limitations were not as severe as Dr. Shashek indicated. At a visit to Crider Health Center in June 2011, it was noted that Plaintiff was "quite stable on Risperdal." (Tr. 482). Additionally, notes from a November 2011 Community Access Training meeting between Plaintiff, his mother, and a case worker indicated that Plaintiff's anger

outbursts had not been an issue since Plaintiff had started attending counseling sessions and taking Risperdal. (Tr. 306). Moreover, state agency psychological consultant Dr. Devore found that Plaintiff had only moderate limitations in several of the areas assessed by Dr. Shashek. (Tr. 20, 452-53).

The above evidence provides support for the ALJ's decision to give Dr. Shashek's opinion only some weight rather than controlling weight, and that decision appears to fall within the available zone of choice. (Tr. 21). *See Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) ("As there is conflicting evidence on the record, the ALJ's determination that the physicians' opinions were not supported by objective medical evidence does not lie outside the available zone of choice."). However, on remand, the ALJ should determine whether his reconsideration of Plaintiff's IQ scores affects his assessment of Dr. Shashek's opinions.

### D. "SOME MEDICAL EVIDENCE" SUPPORTING THE RFC DETERMINATION

Plaintiff also appears to argue that because the ALJ did not give Dr. Shashek's opinions controlling weight, the ALJ's decision is not supported by "some medical evidence." Again, the undersigned will address this issue despite the fact that the ALJ's reconsideration of Plaintiff's IQ scores may render this issue moot or may affect the ALJ's assessment of the relevant medical evidence and Plaintiff's RFC.

Because RFC is a medical question, "some medical evidence 'must support the determination of the claimant's residual functional capacity, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). However, the ALJ is not limited to considering medical evidence directly addressing the claimant's ability to function in the workplace, but "must assess a claimant's RFC based on

all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

Here, it appears that the RFC was supported by "some medical evidence," including medical evidence addressing Plaintiff's ability to function in the workplace, along with other medical and non-medical evidence. As discussed above, the ALJ gave some weight to the opinions of Dr. Shashek regarding Plaintiff's ability to function in the workplace, and he incorporated several of the limitations she identified into Plaintiff's RFC. The ALJ's RFC is also supported by the opinion of state agency psychological consultant Dr. Devore that Plaintiff had only mild or moderate limitations in functioning, which the ALJ gave substantial evidentiary weight. (Tr. 20, 452-53). The ALJ considered this evidence together with Plaintiff's treatment records and his own testimony and self-reported activities in determining Plaintiff's RFC. (Tr. 14-27). However, if the ALJ proceeds past Step Three on remand, the ALJ will need to reconsider Plaintiff's RFC in light of his reconsideration of Plaintiff's IQ scores. When he does so, he should ensure that the RFC determination he reaches is supported by "some medical evidence."

### E. THE TESTIMONY OF THE VOCATIONAL EXPERT

Plaintiff's final argument is that the vocational expert's ("VE's") testimony does not constitute substantial evidence supporting the ALJ's determination at Step Five that Plaintiff could perform other work in the national economy. Again, the undersigned recognizes that ALJ's reconsideration of Plaintiff's IQ scores may render this issue moot or may affect the remaining steps of the analysis. Nevertheless, the undersigned will address this issue.

As discussed above, at Step Five, the Commissioner bears the burden of establishing that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001). "'Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies.'" *Collins v. Astrue*, 648 F.3d 869, 872 (8th Cir. 2011) (quoting *Cox v. Astrue*, 459 F.3d 614, 620 (8th Cir. 2007)). A hypothetical question posed to the VE is sufficient "if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001).

Plaintiff first argues that Commissioner did not meet her burden at Step Five because the VE testified that if an individual with Plaintiff's RFC would have to miss four days of work per month (as Dr. Shashek opined), such a person would be unable to do the jobs the VE identified. However, as discussed above, the ALJ determined that Dr. Shashek's opinion that Plaintiff would miss four days of work per month was inconsistent with her own mild and normal findings and the other evidence suggesting that Plaintiff's conditions were not as severe as Dr. Shashek indicated. The hypothetical question and response on which the ALJ relied properly did not include that limitation because the ALJ found it not supported by the record. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.") (quotation marks omitted). If, on remand, the ALJ again finds that limitation unsupported by the record, the ALJ need not include it in any hypothetical question he poses to the VE.

Plaintiff also argues that the VE's testimony does not constitute substantial evidence because it was based on an inadequate foundation. The VE testified that he relied on his own experience in the field to assess whether Plaintiff's limited ability to follow instructions, deal with changes in routine, and have contact with others would affect Plaintiff's ability to perform the jobs he identified. He noted that these limitations are not addressed in the *Dictionary of Occupational Titles* or in the *Selected Characteristics of Occupations*. (Tr. 60-61). On questioning from Plaintiff's attorney, the VE admitted that he had not, since January 2010, personally placed any individuals in the specific jobs he identified. (Tr. 61).

Plaintiff argues that because the VE had not personally placed any individuals in the specific jobs he identified since January 2010 (Plaintiff's alleged onset date), his testimony does not constitute substantial evidence to support a finding that Plaintiff could perform those jobs. However, Plaintiff cites no authority in support of his argument, and the undersigned declines to recommend that the court impose such a limitation on the testimony of vocational experts. Social Security Ruling 00-04p states, "A VE . . . or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the *DOT*." *See also Saulen v. Astrue*, No. 11-5058-CV-SW-ODS, 2012 WL 1598092, at *3 (W.D. Mo. May 7, 2012) ("A VE is expected to rely on his or her expertise [to] provide further clarification and testimony tailored to the facts of the particular case—something the DOT cannot do."). Plaintiff does not challenge the expert qualifications of the VE in this case and does not argue that the VE's testimony conflicted with the *Dictionary of Occupational Titles*. The ALJ may rely on the VE's expertise to supplement the information in the *Dictionary of Occupational Titles*.

# VI.    CONCLUSION

For the reasons set forth above, the undersigned finds that the decision of the Commissioner was not supported by substantial evidence. Accordingly,

**IT IS HEREBY RECOMMENDED** that decision of the Commissioner of Social Security be **REVERSED** and that this case be **REMANDED** under Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this Report and Recommendation.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of August, 2014.